**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RACHEL JOHNSON, on behalf of herself and all others similarly situated, | ) ) ) | |
| | ) | Case No. 14-cv-2028 |
| Plaintiff, | ) ) | |
| | ) | Honorable Judge Manish Shah |
| v. | ) ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| YAHOO! INC., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |
| ZENAIDA CALDERIN, | ) ) | |
| Plaintiff, | ) ) | Case No. 14-cv-2753 |
| | ) | |
| v. | ) ) | Honorable Judge Manish Shah |
| | ) | |
| YAHOO! INC., | ) ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| Defendant. | ) | |

**DEFENDANT YAHOO! INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS'**
**CORRECTED CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

Francis A. Citera (ARDC # 6185263)
Brett M. Doran (ARDC # 6286057)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 2500
Chicago, IL 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
citeraf@gtlaw.com
doranb@gtlaw.com

Ian C. Ballon (Appearing *Pro Hac Vice*)
Lori Chang (Appearing *Pro Hac Vice*)
Nina D. Boyajian (Appearing *Pro Hac Vice*)
Justin Barton (Appearing *Pro Hac Vice*)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Tel: (310) 586-7700
Fax: (310) 586-7800
ballon@gtlaw.com
changl@gtlaw.com
boyajiann@gtlaw.com
bartonju@gtlaw.com

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................... 1

II.  STATEMENT OF FACTS ....................................................................................... 2

     A.     Yahoo's PC2SMS Service Is A Free Messaging Service ....................................... 2

     B.     Plaintiff Calderin Consented To Receive Text Messages From Yahoo And Received The Welcome Message At The Likely Instigation Of Her Counsel ................................................................................................................. 2

     C.     Plaintiff Johnson Consented To Receive The Welcome Message Through A Third Party And Failed To Preserve Critical Evidence ..................................... 5

III. APPLICABLE LEGAL STANDARD ...................................................................... 6

IV.  ARGUMENT ........................................................................................................... 7

     A.     Plaintiffs Have Not Demonstrated That Class Membership Can Be Ascertained From Collective Evidence ............................................................... 7

               1.     Plaintiffs Failed To Show That Class Members Can Be Identified By Subpoenaing Cellular Providers ..................................................... 8

               2.     Yahoo's Records Cannot Ascertain The Class ........................................ 10

     B.     Common Issues Do Not Predominate Because Liability, Consent, And Revocation Cannot Be Determined Based On Classwide Proof ......................... 13

               1.     Putative Class Members Who Are Yahoo Users Provided Express Consent ...................................................................................... 14

                          i.     The Welcome Message Does Not Require Prior Express *Written* Consent ......................................................... 14

                          ii.     Yahoo Users Provided Prior Express Consent Through The Yahoo Terms Of Service ...................................... 15

                          iii.     Yahoo Users Who Provided Their Phone Numbers To Yahoo Provided Prior Express Consent ............................... 17

               2.     Putative Class Members May Have Provided Consent Through Intermediaries ......................................................................................... 18

               3.     Each Channel Of Consent Involves Numerous Factual Inquiries From Heterogeneous Sources Necessitating Individualized Inquiry ........ 19

     C.     Class Action Is Not Superior To Individual Prosecution Of Claims ................... 20

D.    Neither Plaintiff Is A Typical Or Adequate Class Representative ....................... 22

1.    Plaintiff Calderin Is Not Typical Or Adequate .......................................... 23

2.    Plaintiff Johnson Is Not Typical Or Adequate ........................................... 23

3.    Plaintiffs And Class Counsel Have Abandoned The Interests Of Putative Class Members To Maintain Their Own Claims And Interests ....................................................................................................... 24

V.  CONCLUSION ........................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Aderhold v. Car2go N.A., LLC,*
   No. C13-489RAJ, 2014 WL 794802 (W.D. Wash. Feb. 27, 2014)........................................15

*Agne v. Papa John's Intern., Inc.,*
   286 F.R.D. 559 (W.D. Wash. 2012) ...................................................................................20

*Am. Pipe & Constr. Co. v. Utah,*
   414 U.S. 538 (1974)............................................................................................................21

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)......................................................................................................20, 21

*Amer. Copper & Brass v. Lake City Indust. Prod.,*
   757 F.3d 540 (6th Cir. 2014) ...............................................................................................9

*Baisden v. Credit Adjustments, Inc.,*
   No. 2:13-CV-992, 2015 WL 1046186 (S.D. Ohio Mar. 10, 2015)........................................18

*Balschmiter v. TD Auto Finance LLC,*
   303 F.R.D. 508 (E.D. Wisc. 2014).......................................................................................13

*Birchmeier v. Caribbean Cruise Line, Inc.,*
   302 F.R.D. 240 (N.D. Ill. 2014)......................................................................................9, 10

*Bouaphakeo v. Tyson Foods Inc.,*
   765 F.3d 791 (8th Cir. 2014), *cert granted*, 135 S. Ct. 2806 (2015) .....................................21

*CE Design Ltd. v. King Architectural Metals, Inc.,*
   637 F.3d 721 (7th Cir. 2011) .........................................................................................22, 23

*Chapman v. First Index, Inc.,*
   No. 09 C 5555, 2014 WL 840565 (N.D. Ill. Mar. 4, 2014) ...................................................13

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC,*
   662 F.3d 913 (7th Cir. 2011) ..............................................................................................25

*Culver v. City of Milwaukee,*
   277 F.3d 908 (7th Cir. 2002) ........................................................................................24, 25

*Derby v. AOL, Inc.,*
   No. 15–cv–00452–RM W, 2015 WL 3477658 (N.D. Cal. June 1, 2015) ...............................13

iv

*Espenscheid v. DirectSat USA, LLC*,
    705 F.3d 770 (7th Cir. 2013) ................................................................12

*Forman v. Data Transfer, Inc.*,
    164 F.R.D. 400 (E.D. Pa. 1995)..........................................................22

*Franks v. MKM Oil, Inc.*,
    No. 10 CV 00013, 2012 WL 3903782 (N.D. Ill. Sept. 7, 2012)......................23

*G.M. Sign, Inc. v. Brink's Mfg. Co.*,
    No. 09 C 5528, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011) ...............................6, 25

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
    No. 07 C 5953, 2009 WL 2581324 (N.D. Ill. Aug. 20, 2009).........................9

*G.M. Sign, Inc. v. Franklin Bank, S.S.B.*,
    06 C 949, 2008 WL 3889950 (N.D. Ill. 2008).........................................9

*G.M. Sign, Inc. v. Grp. C Commc'ns, Inc.*,
    No. 08-cv-4521, 2010 WL 744262 (N.D. Ill. Feb. 25, 2010) ................................14

*Glauser v. GroupMe, Inc.*,
    No. C 11-2584 PJH, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015)............................13

*In re: Google Inc. Gmail Litig.*,
    No.: 13-MD-02430-LHK, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ...........16

*Hudson v. Sharp Healthcare*,
    13-CV-1807-MMA (NLS), 2014 WL 2892290 (S.D. Cal. June 25, 2014)...........18

*Jamison v. First Credit Servs., Inc.*,
    290 F.R.D. 92 (N.D. Ill. 2013)......................................................9, 13

*Kristensen v. Credit Payment Services*,
    12 F. Supp. 3d 1292, 1303 (D. Nev. 2014) ..........................................9, 20

*Kucala Enter., Ltd. v. Auto Wax Co.*,
    No. 02 C 1403, 56 Fed. R. Serv. 3d (Callaghan) 487 (N.D. Ill. May 27, 2003)..........24

*Langendorf v. Skinnygirl Cocktails, LLC*,
    No. 11 CV 7060, 2014 WL 5487670 (N.D. Ill. Oct. 30, 2014) .............................23

*Lee v. Stonebridge Life Ins. Co.*,
    289 F.R.D. 292 (N.D. Cal. 2013)...................................................9, 20

*Mais v. Gulf Coast Collection Bureau, Inc.*,
    768 F.3d 1110 (11th Cir. 2014) ....................................................18, 20

v

*McKenna v. WhisperText,*
No. 5:14-cv-00424-PSG, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015) .................................13

*Modica v. Green Tree Servicing, LLC,*
No. 14 C 3308, 2015 WL 1943222 (N.D. Ill. Apr. 29, 2015) .................................................13

*Murphy v. DCI Biologicals Orlando, LLC,*
No. 6:12-cv-1459-Orl-36KRS, 2013 WL 6865772 (M.D. Fla. Dec. 31, 2013) .....................18

*N.B. v. Hamos,*
26 F.Supp.3d 756, 763 (N.D. Ill. 2014) ..................................................................................7

*ProCD, Inc. v. Zeidenberg,*
86 F.3d 1447 (7th Cir. 1996) .................................................................................................16

*Reliable Money Order, Inc. v. McKnight Sales Co.,*
704 F.3d 489 (7th Cir. 2013) .................................................................................................23

*Robins v. Spokeo, Inc.,*
742 F.3d 409 (9th Cir. 2014), *cert granted*, 135 S. Ct. 1892 (U.S. Apr. 27,
2015) ........................................................................................................................................21

*Saltzman v. Pella Corp.,*
257 F.R.D. 471 (N.D. Ill. 2009) .............................................................................................11

*Savanna Group v. Truan,*
No. 10 C 7995, 2013 WL 626981 (N.D. Ill. Feb. 220, 2013) ...............................................25

*Sec'y of Labor v. Fitzsimmons,*
805 F.2d 682 (7th Cir. 1986) .................................................................................................24

*Shurland v. Bacci Café & Pizzeria on Ogden, Inc.,*
271 F.R.D. 139 (N.D. Ill. 2010) .............................................................................................11

*Smith v. Microsoft Corp.,*
297 F.R.D. 464 (S.D. Cal. 2014) ...........................................................................................22

*Spencer v. Cent. States, Se. & Sw. Areas Pension Fund,*
778 F. Supp. 985 (N.D. Ill. 1991) ..........................................................................................14

*Stern v. DoCircle, Inc.,*
No. SACV 12-2005 AG, 2014 WL 486262 (C.D. Cal. Jan 29, 2014) ...................................20

*Szabo v. Bridgeport Machines, Inc.,*
249 F.3d 672 (7th Cir. 2001) ...................................................................................................7

*Targin Sign Sys. v. Preferred Chiropractic Ctr.,*
679 F. Supp. 2d 894 (N.D. Ill. 2010) ......................................................................................9

*In re Trans Union Corp. Privacy Litig.*,
    211 F.R.D. 328 (N.D. Ill. 2002)........................................................................22

*Wachtel v. Guardian Life Ins. Co.*,
    453 F.3d 179 (3d Cir. 2006)............................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011).....................................................................................7

*Wolfkiel v. Intersections Ins. Servs. Inc.*,
    303 F.R.D. 287 (N.D. Ill. 2014).......................................................................6

*In re Yahoo Mail Litig.*,
    7 F. Supp. 3d 1016 (N.D. Cal. 2014)..............................................................16

*In Re Yahoo Mail Litig.*,
    Case No. 13-cv-04980, 2015 WL 3523908, ___ F.R.D. ___ (N.D. Cal. May
    26, 2015)........................................................................................................17

**State Cases**

*Karen S. Little, LLC v. Drury Inns, Inc.*,
    306 S.W.3d 577 (Mo. Ct. App. 2010)............................................................20

**Federal Statutes**

15 U.S.C. § 7001 ...............................................................................................15

47 U.S.C. § 227(b)(C).........................................................................................20

**Rules**

Federal Rules of Civil Procedure, Rule 23 ...................................................24, 25

Federal Rules of Civil Procedure, Rule 23(a) .....................................................6

Federal Rules of Civil Procedure, Rule 23(a)(3) ...............................................22

Federal Rules of Civil Procedure, Rule 23(a)(4) ...............................................22

Federal Rules of Civil Procedure, Rule 23(b)(2) ...............................................17

Federal Rules of Civil Procedure, Rule 23(b)(3) .........................................*passim*

Federal Rules of Civil Procedure, Rule 23(g)(2) ...............................................24

**Regulations**

47 C.F.R. § 64.1200(a)(3)...................................................................................14

**Constitutional Provisions**

U.S. Constitution, Article III ........................................................................................21

**Other Authorities**

137 Cong. Rec. S16204-01, 1991 WL 229525 (daily ed. Nov. 7, 1991)......................................21

Federal Trade Commission Consumer Information: Phishing,
    http://www.consumer.ftc.gov/articles/0003-phishing (last accessed July 17,
    2015) ....................................................................................................................12

*Matter of GroupMe, Inc./Skype Commc'n S.A.R.l Pet. for Expedited Declaratory
    Rul. R. & Regulations Implementing the Tel. Consumer Protec. Act of 1991*,
    29 F.C.C. Rcd. 3442 (F.C.C. 2014) ...............................................................18

*In Re Rules and Regulations Implementing the Telephone Consumer Protection
    Act of 1991*,
    Declaratory Ruling.....................................................................................10, 13

U.S. Figures from CTIA's Annual Survey Report, http://www.ctia.org/your-
    wireless-life/how-wireless-works/annual-wireless-industry-survey (last
    accessed July 17, 2015)...............................................................................10

## I.   <u>INTRODUCTION</u>

This case is based on a single informational, non-marketing, notification message ("Welcome Message") appended to a Yahoo user's own message sent via Yahoo Messenger's free PC2SMS service. The Welcome Message alerts the recipient that she has received a message from another Yahoo user, explains what the message is, and what to do if the recipient wants to respond or wants additional information, including about blocking future messages. The Welcome Message is not the type of annoying, intrusive mass communication forced onto consumers by telemarketers that the Telephone Consumer Protection Act ("TCPA") was enacted to prevent. In fact, the FCC has recognized that informational messages are "highly desirable" to consumers and should not be discouraged. The PC2SMS platform is a free service that benefits the elderly, visually impaired, and others who cannot easily compose messages on small smart phone screens or do not have access to or cannot afford a smart phone. Nevertheless, plaintiffs (one of whose claim seems to have been instigated by her counsel and the other who disposed of critical evidence during the course of this litigation) seek to certify a class of people who received the Welcome Message on one occasion, and seek ███████████████████ in statutory damages despite no economic injury or harm.

Plaintiffs' proposed Class and Subclasses are fundamentally flawed. First, the Class is not ascertainable. Second, individualized issues of liability and consent predominate over class questions because there is no way, absent individualized inquiries, to determine whether a class member provided prior express consent (and whether that consent was subsequently revoked). Third, plaintiffs' contorted (and belatedly revised) Class and Subclass definitions promote piecemeal litigation and are therefore not superior. In addition, the availability of statutory damages and the ability for putative class members to obtain relief in small claims court also makes certification of a federal class action inferior. Fourth, plaintiffs are not adequate representatives and their claims are

not typical of the class because their conduct prior to and subsequent to receiving the Welcome Message puts plaintiffs' interests in conflict with those of other putative class members and subjects them to unique defenses. The proposed Class and Subclasses simply do not withstand the rigorous analysis required by Rule 23(b)(3).[1]

## II. STATEMENT OF FACTS

### A. Yahoo's PC2SMS Service Is A Free Messaging Service

Yahoo's PC2SMS Service allows registered Yahoo users to send an SMS message from their computers. Declaration of A. Doron ("Doron Decl.") ¶ 3. When a Yahoo user sends a PC2SMS message to a cell phone number for the first time, an informational Welcome Message is appended to the user's message explaining to the recipient that the text was sent by a Yahoo user since it otherwise appears to come from an unknown short code (*e.g.*, 92701), rather than a phone number or name. *Id.* ¶ 8. The Welcome Message provides a link to Yahoo's website where the recipient can obtain further information, including on how to block Yahoo users. *Id.*

The PC2SMS Service is a free communication tool available to those users who would not otherwise be able to send or afford to send text messages. Declaration of D. Boyd ("Boyd Decl.") ¶¶ 7, 15. It is not designed to be used as a mobile marketing platform. Doron Decl. ¶ 5. In fact, it *cannot* be used to send messages in bulk, or even messages already prepared; it can be used only to send a single, original message, manually typed by a single person, addressed to a single person, one at a time, and is not even capable of sending the same message to a group. *Id.*

### B. Plaintiff Calderin Consented To Receive Text Messages From Yahoo And Received The Welcome Message At The Likely Instigation Of Her Counsel

Calderin has a Yahoo account. Declaration of Nina D. Boyajian ("Boyajian Decl.") Ex. K (Dep. of Z. Calderin ("Calderin Dep.") at 31:3-32:1). She created her Yahoo account, ███████, in

---

[1] By Order dated July 6, 2015 [Dkt. 129], the Court granted Yahoo's unopposed motion for extension of time and leave to file an oversized brief. Dkt. 127.

May 2006, and agreed to both the Universal Terms of Service agreement ("uTOS") and Communications Additional Terms of Service agreement ("Comms ATOS") in March 2012 during the migration to Yahoo's new mail platform. Doron Decl. ¶ 45; Declaration of J. Andrews ("Andrews Decl.") ¶ 18. Calderin therefore assented to the uTOS and the Comms ATOS prior to receiving the Welcome Message on April 7, 2014, thereby expressly agreeing that Yahoo could contact her through SMS about its services. Doron Decl. ¶ 44; Andrews Decl. ¶¶ 8, 14, 19. In January 2010, Calderin chose to add her mobile number to her ████████ Yahoo account. Doron Decl. ¶ 45.

Calderin *also* consented to receive the Welcome Message through her friend and co-worker Andrew Jimenez. Calderin Dep. 36:14-37:12; Boyajian Decl. Ex. N (Dep. of A. Jimenez ("Jimenez Dep.")) 12:9-24.[2] Calderin and Jimenez worked "feet from each other," socialized outside of work and regularly communicated by text. Calderin Dep. 38:23-39:8; Jimenez Dep. 16:3-8, 17:2-18:2; *see also* Calderin Dep. Ex. 4 (Calderin's phone records) (relevant excerpts attached as Ex. M to Boyajian Decl.) CALDERIN00029-45 (showing, from March 24 to April 19, 2014, 48 text messages between Calderin and Jimenez).[3] One of Calderin's attorneys in this lawsuit is Jimenez's friend Alexander Arezina, who assisted Jimenez in March and April 2014 in connection with another lawsuit. Jimenez Dep. 19:14-21:9. Jimenez sent the April 7, 2014 PC2SMS message to Calderin shortly after speaking with Arezina. Jimenez Dep. 22:12-23:19. The timing of the communications among these three individuals strongly indicates that Calderin's attorney instigated her receipt of Welcome Message in order to generate this lawsuit.[4]

---

[2]   Jimenez agreed to appear for his deposition only after Yahoo was forced to file a motion for rule to show cause as to why he should not be held in contempt. Dkt. 98. Yahoo incorporates by reference the facts set forth in that motion regarding the relationships between Jimenez, Calderin and Arezina.
[3]   For the Court's convenience, in the relevant excerpts of Calderin Dep. Ex. 4 attached as Ex. M to the Boyajian Declaration, Yahoo has highlighted the dates and times of the calls and texts between Calderin and Jimenez in yellow, and the dates and times of the calls and texts between Calderin and Arezina in orange.
[4]   A summary of the calls and text messages between Arezina, Jimenez and Calderin from April 6 to April 9, 2014 is attached as Ex. P to the Boyajian Declaration.

On April 6, 2014, a Sunday, beginning at 8:55 p.m., Arezina and Jimenez exchanged seven text messages. Jimenez Dep. Ex. 3 (Jimenez's phone records) (relevant excerpts attached as Ex. O to Boyajian Decl.) at 6.[5] On April 7, at 7:39 a.m., Jimenez received a text message from Arezina. *Id*. Jimenez testified that he spoke to Arezina just before sending the PC2SMS message to Calderin:

> [Arezina] asked me if I used Yahoo Messenger. I said I have used it, and briefly through that conversation he asked if I had ever seen a marketing, like a message from Yahoo while using Messenger… He asked me: Do you recall ever, you know, using Yahoo Messenger and anything coming up at that? And I said: I don't know.

Jimenez Dep. 36:19-37:10. Jimenez then immediately logged into his Yahoo Messenger account and sent a PC2SMS message to Calderin at 9:29 a.m., despite standing close to her:

> So after we [Jimenez and Arezina] hung up, you know, I looked through my Messenger to see what exactly he was talking about. … I looked up and saw [Calderin] there, and she was on her phone, so I just sent her a brief message and didn't know what was going to come out of it, so I sent her…: Hi, I hate you. Love you, bye.

*Id*. at 37:13-21, 41:8-13, 56:22-57:7. Two minutes later, at 9:31 a.m., Jimenez texted Arezina, starting a flurry of twenty-five text messages between them until 10:27 a.m., including a text from Jimenez to Arezina at 10:25 a.m. and two response texts from Arezina at 10:27 a.m. Jimenez Dep. Ex. 3 at 7. At this same time, Calderin appears to have taken a screenshot of her phone at 10:25 a.m., showing the PC2SMS message and the Welcome Message on her phone. Calderin Dep. Ex. 2 (relevant excerpts attached as Ex. L to Boyajian Decl.).

Jimenez testified that Calderin was "a little agitated" about receiving the Welcome Message, asking him "How do I get it to stop?" Jimenez Dep. 51:14-24, 53:8-20. It was "at that moment that [Jimenez] pass[ed] her Alex's [Arezina] phone number." *Id*. 53:8-20. In giving Arezina's phone

---

[5]     For the Court's convenience, in the relevant excerpts of Jimenez Dep. Ex. 3 attached as Ex. O to the Boyajian Decl., Yahoo has highlighted the dates and times of the calls and texts between Jimenez and Arezina in yellow. Jimenez did not produce any text messages with Arezina because Jimenez no longer possesses the telephone he used to communicate with Arezina. Jimenez Dep. 29:9-16. In addition, a comparison of Jimenez's phone records with Calderin's phone records demonstrates that the times listed for Calderin's calls and texts appear to be provided in PST, rather than CST, as the times listed for Calderin's text communications with Jimenez are consistently two hours earlier than the times listed in Jimenez's phone records for the same communications.

number to Calderin, Jimenez informed Calderin that she "might have something based off" receiving the Welcome Message. Calderin Dep. 19:15-22.

On April 8, 2014, Arezina and Jimenez exchanged twenty-four text messages. Jimenez Dep. Ex. 3 at 8-9. At 9:13 a.m. on April 9, 2014, Arezina texted Jimenez and they exchanged texts until Arezina called Jimenez at 9:33 a.m., speaking for 23 minutes. *Id*. at 5, 10. From 10:04 a.m. to 10:21 a.m., Jimenez and Arezina exchanged three more texts. *Id*. at 10. At 10:24 a.m., Arezina texted Calderin. Calderin Dep. Ex. 4 at CALDERIN00036. At 10:46 a.m., Arezina texted Jimenez, who responded at 10:48 a.m. Jimenez Dep. Ex. 3 at 10. Three minutes later, at 11:51 a.m., Calderin responded to Arezina's 10:24 a.m. text. Calderin Dep. Ex. 4 at CALDERIN00036. They exchanged a few more texts (*id*.) until Calderin called Arezina at 12:06 p.m. *Id*. at CALDERIN00025. This call lasted 18 minutes, during which – at 12:14 p.m. – Calderin sent a text to Arezina. *Id*. at CALDERIN00036. At 8:45 p.m. that evening, Arezina texted Jimenez, who responded at 8:50 p.m. Jimenez Dep. Ex. 3 at 11. One week later, Arezina filed this lawsuit on behalf of Calderin.

**C.**     **Plaintiff Johnson Consented To Receive The Welcome Message Through A Third Party And Failed To Preserve Critical Evidence**

Discovery has revealed evidence that plaintiff Johnson consented to receive the Welcome Message through a third party – the sender of the personalized message that triggered the Welcome Message. The underlying text message that Johnson received stated: "Do you want to be freed from of [sic] your payday advance loans call _888.9064165." Mot. at 2. In 2008, Johnson filled out online applications for personal loans through CashCall.com, which would have required her to input her contact information. Boyajian Decl. Ex. R (Dep. of C. Teager ("Teager Dep.") 93:22-96:16). By signing the CashCall promissory notes, Johnson expressly agreed to receive phone calls and text messages using an automatic dialing system. Boyajian Decl. Ex. S (Teager Dep. Ex. 17). Thus it is likely that the text message Johnson received – which concerned personal loans – and that triggered

5

the Welcome Message could have been from an affiliate of the company to which she provided prior express consent.

Johnson received the Welcome Message on March 19, 2013. *See* Johnson Compl. ¶19. Teager, Johnson's partner, who has also been a plaintiff in at least sixteen TCPA or FDCPA lawsuits since 2011 arising from debt collection telephone calls (Teager Dep. 76:23-77:24), reviewed all of the text messages on Johnson's phone, typed the message contents into her computer, took a picture of the text messages, and then around January or February 2014, sent those pictures to an attorney who had represented both Teager and Johnson in a number of other class action suits. *See id*. 32:8-22, 74:10-75:4. On March 21, 2014, Johnson filed this action.

In May 2014, Johnson switched from Sprint to AT&T and got a new cell phone. Teager Dep. 40:19-41:8, 42:3-11; Johnson Dep. 51:6-16. At some point in time after May 2014 ***and during the course of the litigation***, she lost, misplaced, or otherwise disposed of the cell phone on which she received the Welcome Message. Teager Dep. 117:13-118:18; Johnson Dep. 78:11-24.

## III. <u>APPLICABLE LEGAL STANDARD</u>

A class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Plaintiffs have the burden to demonstrate that the proposed class meets all four requirements of Rule 23(a); *Wolfkiel v. Intersections Ins. Servs. Inc.*, 303 F.R.D. 287, 293 (N.D. Ill. 2014); *G.M. Sign, Inc. v. Brink's Mfg. Co.*, No. 09 C 5528, 2011 WL 248511, at *3 (N.D. Ill. Jan. 25, 2011).

Plaintiffs must also demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs must "affirmatively demonstrate" that the case can be tried on a classwide basis. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

In considering whether to certify a class, the court need not accept plaintiff's allegations as true, but rather "should make whatever factual and legal inquiries are necessary" to resolve the issue of class certification presented by the record. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). Indeed, a court must engage in a "rigorous analysis" and evaluate the "merits of the plaintiff's underlying claim." *Dukes*, 131 S. Ct. at 2551.

## IV.    <u>ARGUMENT</u>

### A.   <u>Plaintiffs Have Not Demonstrated That Class Membership Can Be Ascertained From Collective Evidence</u>

In considering a class certification motion, the court must first determine whether the proposed class is ascertainable. *See N.B. v. Hamos*, 26 F.Supp.3d 756, 763 (N.D. Ill. 2014) ("[T]here must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.") (citation omitted).

Recognizing that the class definitions as originally pled were unascertainable, plaintiffs have materially and arbitrarily revised the proposed class, in the guise of "efficacy," and have created a convoluted, inefficient, and ultimately wholly unworkable proposed class structure. Plaintiffs now propose a Class and Subclasses whose members were sent the Welcome Message, and (1) were a Sprint customer in March 2013 whose number was not associated with a Yahoo account, or (2) a T-Mobile customer in April 2014 whose telephone number was associated with a Yahoo account. Mot. at 3-4. Plaintiffs propose ascertaining the class in two ways: (1) from records plaintiffs intend to obtain from T-Mobile and Sprint (despite the carriers' refusal to produce some or all of the requested information); and (2) by cross-referencing two unrelated Yahoo databases, (1) the Optin DB and (2)

7

User Database ("UDB"), which is intended to protect user privacy and therefore only contains minimal information that was obtained over a 20 year period. Mot. at 2, 8-10. The proposed methods neither independently nor collectively show that the class is ascertainable.

### 1. Plaintiffs Failed To Show That Class Members Can Be Identified By Subpoenaing Cellular Providers

Sprint's and T-Mobile's[6] records will not ascertain class members, even if Sprint and T-Mobile were to provide complete subscriber information.[7]

First, the **subscriber** of a phone number is often not the person who received the text. And determining whether the subscriber is, in fact, the person who received the text will generally require an individualized inquiry. The reason is simple: the majority of Sprint and T-Mobile subscribers are on business or family phone plans, which contain multiple phone numbers and users – sometimes hundreds of numbers on a single account. Aron Decl. at ¶ 34 (during the second half of 2013, between 62% and 71% of Sprint's postpaid subscribers were on family plans while between 65% and 77% of T-Mobile postpaid subscribers were on family plans during that same period). Indeed, both named plaintiffs are part of group plans that do not identify either of them individually. *Neither plaintiff would be identifiable through the carriers' records as class members. See id*. ¶¶ 28, 33.

Second, the subscriber data for users of prepaid accounts – comprising approximately one-third of both Sprint's and T-Mobile's telephone numbers – is incomplete and unreliable. *Id*. ¶¶ 35-36 (as of Q3 2014, approximately 30% of T-Mobile's total retail customers were prepaid customers and similarly in March 2013, 34% of Sprint's total retail customers held prepaid accounts); *see also*

---

[6]     Yahoo's unopposed motion for extension of time to file this Response was premised on the parties' "agree[ment] that Yahoo should be afforded a reasonable opportunity to review and address the new information provided by T-Mobile" [Dkt. 127 ¶8], which the parties anticipated they would have received by July 16 or 17. As of this writing, T-Mobile has not provided any additional information. Yahoo respectfully requests the opportunity to address any new information provided by T-Mobile to the extent it is relevant to its arguments in opposition to class certification.
[7]     Sprint has refused to provide information for California subscribers based on California privacy laws. Boyajian Decl. ¶ 8. T-Mobile, which has not yet provided any subscriber information, has advised that it cannot do so for California, Pennsylvania, and Delaware subscribers based on those states' privacy laws. Boyajian Decl. ¶ 7, Ex. T (T-Mobile Declaration).

Boyajian Decl. Ex. T. Neither Sprint nor T-Mobile requires a name or address to obtain a prepaid phone. Aron Decl. ¶ 35; *see also* Boyajian Decl. Ex. T, ¶¶ 5-6 ("If personal information happens to be provided upon activation of a prepaid account, T-Mobile does not take any steps to verify the completeness or accuracy of such information.").

Because the Sprint and T-Mobile subscriber information will not reliably allow for the identification of recipients of the Welcome Message without individualized inquiries, the class is not ascertainable. *See Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 109 (N.D. Ill. 2013) (ruling the class was not ascertainable because there was no way to identify the actual recipients of the calls through call records).

The TCPA cases on which plaintiffs rely in support of ascertainability are inapposite. Most of these cases involve blast fax advertisements, rather than text messaging. In none of these fax cases did the court consider whether the individuals who would be identified using a list of numbers would actually correspond to the recipients of the fax at issue.[8] The few text messaging cases plaintiffs cite – each from outside the Seventh Circuit – also fail to provide support.[9]

Plaintiffs' reliance on *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240 (N.D. Ill. 2014) is similarly misplaced. The defendant in *Birchmeier* did not submit any evidence of – and the court therefore did not consider – the issue of ascertaining the identities of users within a group or prepaid phone plan. The court acknowledged that the subscriber may not have been the recipient of the call but did not consider whether the phone number list would enable the actual called party to be

---

[8] *See Amer. Copper & Brass v. Lake City Indust. Prod.,* 757 F.3d 540, 545 (6th Cir. 2014) (taking at face value, and noting that defendant waived any objection, that fax numbers can be tied to the actual recipients); *Targin Sign Sys. v. Preferred Chiropractic Ctr.*, 679 F. Supp. 2d 894, 897-98 (N.D. Ill. 2010) (noting without analysis that each fax number represents a subscriber and can be matched to names); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, at *8 (N.D. Ill. Aug. 20, 2009) (taking at face value, and without challenge from defendant, that a fax log could be used to identify class members); *G.M. Sign, Inc. v. Franklin Bank, S.S.B.*, 06 C 949, 2008 WL 3889950, at *3 (N.D. Ill. 2008) (noting that fax logs provided both phone numbers **and the names** of the recipients of the fax message at issue).
[9] *See, e.g., Kristensen v. Credit Payment Services,* 12 F. Supp. 3d 1292, 1303 (D. Nev. 2014) (taking at face value that "calling lists" could be used to identify class members, but not considering whether the individuals identified using the list's phone numbers would actually correspond to the recipients of the text message at issue); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292, 295 (N.D. Cal. 2013) (same).

9

identified, finding only that it was not necessary to identify the "actual subscribers" of the phone numbers at issue because the subscriber may not have been the called party in any event.[10] The type of evidence presented here, therefore, on ascertainability, including by expert declaration, was never presented or considered in *Birchmeier*.

Furthermore, putative class members may not be able to self-identify because they, like plaintiff Johnson, no longer have their phones from March 2013 or April 2014 or, even if they do, have not saved the Welcome Message because of the large volume of text messages most Americans receive, 98% of which typically are reviewed within three minutes of receipt (and presumably then often are discarded). *See* Aron Decl. ¶ 51 (Americans on average replaced their phone every 22.4 months in 2013, and 26.5 months in 2014); Boyajian Decl. Ex. AC (*In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order (July 10, 2015) ("FCC Ruling")) FCC Ruling ¶ 128; Boyajian Decl. Ex. U; Cellular Telephone Industries Association ("CTIA") Annual Wireless Industry Survey (between December 2012 and December 2013, Americans received between 457 and 525 text messages each month).[11]

### 2.  Yahoo's Records Cannot Ascertain The Class

Plaintiffs argue that class members may be identified by cross-referencing data from Yahoo's Optin DB and UDB databases, but this is not true. The Optin DB contains only the list of phone numbers that received the Welcome Message, but no other contact information. Doron Decl. ¶¶ 12, 14. The Optin DB was created solely for the purpose of preventing individuals from receiving multiple copies of the Welcome Message within a specific period. Doron Decl. ¶ 11. In other words,

---

[10]    While Dr. Aron submitted an expert report and testified at deposition regarding the availability of certain kinds of telecommunications data in *Birchmeier*, she did not offer an opinion regarding whether members of the proposed class can be identified using plaintiff's methodology or on any other class certification issues in that matter.

[11]    Yahoo respectfully requests that the Court take judicial notice of this survey. *See* CTIA Your Wireless Life: Annual Wireless Industry Survey, Year-End U.S. Figures from CTIA's Annual Survey Report, http://www.ctia.org/your-wireless-life/how-wireless-works/annual-wireless-industry-survey (last accessed: July 17, 2015).

it is a database of numbers to exclude from future communications.

The UDB, by contrast, records registered Yahoo user account information. *Id*. ¶15. Yahoo allows users the choice of providing names and other identifying information, or nothing more than a Yahoo ID (often not the user's name – such as Calderin's Yahoo ID, ███████). *Id*. ¶ 18. In other words, nothing more than a user ID is required from a user to create a Yahoo account. *Id*. ¶¶ 18, 21-24. Moreover, even where users include additional information, it is often incomplete, inaccurate, or out of date. *See* Boyajian Decl. Exs. V, W, X. The UDB records information that has been input, compiled, and stored over the past 20 years. Doron Decl. ¶ 20. Common sense dictates that much of the contact information provided 10, 15, or 20 years ago may no longer be valid.

Even where phone numbers can be "associated" with a user account, the person who had the number at the time it was provided to Yahoo may not have had that same number during the two one-month class periods. *See* Aron Decl. ¶¶ 43-44. Also, in many instances, a single telephone number is associated with more than one Yahoo ID. Doron Decl. ¶ 29 (one number associated with ██ separate Yahoo IDs).

Neither class members nor the Yahoo users who sent a PC2SMS message can be ascertained from Yahoo's records. Ultimately, the Court would need to resort to individualized inquiries to determine who belongs in the class, which is administratively infeasible. *See Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 (N.D. Ill. 2009) (criteria for identifying a class "must make it administratively feasible for the court to determine whether a particular individual is a class member").

These ascertainability issues will also present substantial difficulties in providing notice to the class, which is appropriately considered at this stage of the proceedings. *See Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139, 143 (N.D. Ill. 2010) ("[D]ifficulties in managing a class action are a factor the court must consider…."). Because the wireless carriers do not require

contact information for prepaid customers or for all persons (like plaintiffs) who are on group plans, plaintiffs would have to rely on class members' email addresses (for those in Subclass B) or notice by publication. With respect to the Yahoo email addresses, which exist for less than 40% of the Class (*see* Declaration of J. Hansen, Dkt. 100-12, ¶¶ 13-19), notice by email may not be effective because the email address may not be the class member's primary address (because Yahoo has been in existence for over 20 years), the notice may go to the spam folder, or it may be ignored because people do not expect to receive such notices in their personal email accounts or would assume that the notice was a phishing scam or other SPAM that the Federal Trade Commission urges consumers not to even open. *See* Federal Trade Commission Consumer Information: Phishing, http://www.consumer.ftc.gov/articles/0003-phishing (last accessed July 17, 2015).[12] Notice by publication also likely will be ineffective because it is hard to imagine that a putative class member would remember receiving this non-personal text message during a specific one month period more than one to two years ago (particularly because many people, like Johnson, would not have the same cell phone as they had when they received the Welcome Message). *See* Aron Decl. ¶¶ 48-50.

Plaintiffs have therefore failed to meet their burden that the proposed Class is ascertainable. They have also failed to offer any proposal for how this action will be tried, including identifying the class members, determining issues of liability, and distributing any classwide relief. Indeed, it is difficult to conceive how the case could be efficiently tried where issues of liability, consent (and potentially revocation of consent) would need to be tried individually.[13]

---

[12] It is also deeply ironic that plaintiffs propose to "remedy" the "harm" caused by receipt of an appended Welcome Message that serves to protect consumers and afford better blocking options than the carriers themselves provide by sending unsolicited messages. *See* Expert Report of Danah Boyd ¶¶ 22-25.

[13] *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771 (7th Cir. 2013) (decertifying subclasses because trial plan submitted by plaintiffs was infeasible); *see also Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 186 (3d Cir. 2006) (a plaintiff must offer a trial plan demonstrating how a class will actually be tried through a "full and clear articulation of the litigation's contours at the time of class certification.").

**B.** **Common Issues Do Not Predominate Because Liability, Consent, And Revocation Cannot Be Determined Based On Classwide Proof**[14]

Plaintiffs cannot satisfy the Rule 23(b)(3) predominance requirement because individual questions of consent will overwhelm any common issues. *E.g., Balschmiter v. TD Auto Finance LLC*, 303 F.R.D. 508, 527 (E.D. Wisc. 2014) ("Whether the predominance requirement can be met is often outcome determinative in TCPA litigation [where] determining whether members of the class provided prior express consent would involve individualized inquiries.").

"Where a defendant has set forth specific evidence demonstrating consent and the plaintiff has presented no method by which consent or lack thereof can be ascertained on a classwide basis, courts have declined to certify a class." *Chapman v. First Index, Inc.*, No. 09 C 5555, 2014 WL 840565, at *2 (N.D. Ill. Mar. 4, 2014); *see also Jamison*, 290 F.R.D. at 108 (TCPA class not ascertainable where proposed class definition "could include thousands of individuals who consented to receiving calls on their cell phones," including those who gave their wireless number as part of a credit application).

Here, many, if not most, putative class members will have consented to receive the Welcome Message through one or a variety of ways, but determining which of those channels constitute prior express consent necessitates fact-intensive, individualized inquiries, such as:

---

[14] Plaintiffs incorrectly state that "[t]he only other provision of the TCPA conceivably at issue is … whether Yahoo had 'prior express consent' or 'prior express written consent'" because the Court denied Yahoo's early motion for summary judgment on the ATDS issue. Mot. at 6. The Court considered the issue of human intervention under the FCC's interpretation, but denied Yahoo's motion because "[t]he parties have <u>not</u> briefed whether a more specific definition of 'human intervention' exists." (emphasis added) Dkt. 89 n.11. There is recent authority interpreting "human intervention," postdating this Court's order, under which the PC2SMS Service would not be classified as an ATDS. *See, e.g., Glauser v. GroupMe, Inc.*, No. C 11-2584 PJH, 2015 WL 475111, at *6 (N.D. Cal. Feb. 4, 2015); *Modica v. Green Tree Servicing, LLC*, No. 14 C 3308, 2015 WL 1943222, at *3 (N.D. Ill. Apr. 29, 2015); *McKenna v. WhisperText*, No. 5:14-cv-00424-PSG, 2015 WL 428728, at *1, 3-5 (N.D. Cal. Jan. 30, 2015)*; Derby v. AOL, Inc.*, No. 15–cv–00452–RM W, 2015 WL 3477658, *4 (N.D. Cal. June 1, 2015). The most recent FCC order confirms that "[h]ow the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment … and is therefore a case-by-case determination." FCC Ruling ¶ 17. The FCC also clarified that a system, like PC2SMS, that does not have the "present ability" to be an autodialer, must have more than a "theoretical possibility" of becoming an autodialer to qualify as an ATDS. *Id.* ¶ 18. Transforming the PC2SMS Service into an ATDS is no more than, at best, a theoretical possibility. Accordingly, the alleged use of an ATDS is very much still at issue in this case.

13

- whether the putative class member provided consent through an intermediary (*e.g.*, through the Yahoo user who sent them the personalized text message);

- whether the individual is a Yahoo user, and if so, which Yahoo terms of service the user agreed to (and when);

- whether the Yahoo user provided his/her cell phone number to Yahoo (and when);

- whether the Yahoo user agreed to a version of the Yahoo terms of service agreements by downloading a Yahoo application, in which case Yahoo's records would not reflect which agreement was assented to by the user;

- whether the Yahoo user has more than one Yahoo account;

- whether and when the individual revoked, using "any reasonable method, including orally or in writing," previously given consent;[15] and

- whether, even if the subscriber did not provide consent, the account holder did (and whether either subsequently revoked that consent).[16]

These variances illustrate that the issue of consent cannot be resolved without individual factual inquiries for each class member. Doron Decl. ¶¶ 31-38.[17]

### 1. Putative Class Members Who Are Yahoo Users Provided Express Consent

#### i. The Welcome Message Does Not Require Prior Express *Written* Consent

The 2013 FCC rule requiring "prior express *written* consent" for marketing messages (*see* 47 C.F.R. § 64.1200(a)(3)) does not apply to PC2SMS messages sent during the class periods because

---

[15]    The recent FCC Ruling clarifies not only that "consumers [may] revoke consent if they decide they no longer wish to receive voice calls or texts" but that they may do so using "any reasonable method, including orally or in writing" and that revocation may be effective even where a defendant was unaware of the revocation but has "reason to know" of it. FCC Ruling ¶¶ 56, 58 & n.223, 64. Without individualized proof, there is no way to determine whether a person provided consent, nor whether that person subsequently revoked consent orally or in writing, whether the purported revocation was reasonable, and whether the sender of the message either knew or had reason to know of the revocation. While the Optin DB records whether a person has revoked their consent to receive PC2SMS messages by opting out through the PC2SMS Service, a recipient could attempt to revoke their consent to receive PC2SMS messages through other means, either orally in writing, and either directly to Yahoo or through a third party. Doron Decl. ¶__. Therefore, determining whether a putative class member may have revoked consent – particularly if done orally or through a third party – is an inherently fact-dependent inquiry that forecloses class certification. *See, e.g.*, *Spencer v. Cent. States, Se. & Sw. Areas Pension Fund*, 778 F. Supp. 985, 991 (N.D. Ill. 1991) (denying class certification where the claims were based on oral representations because "the substance and presentation of [the oral representations] likely varied from group to group").

[16]    Recognizing the prevalence of group plans, the FCC broadened the scope of the individuals who could provide consent to include both the subscriber (the person billed for a call) *and*, if different, the non-subscriber customary user of a number. *See* FCC Ruling ¶ 73. Accordingly, even if the putative class member did not provide consent, Yahoo would have had consent to send the message if the subscriber had consented to receive text messages from Yahoo (by, for example, opening a Yahoo account and accepting one of the versions of Yahoo's terms of service). *Id.* ¶¶ 73-76. Thus, in Calderin's case, an inquiry would have to be made of both Calderin and her mother, who is the subscriber (or account holder), to determine whether either provided consent and/or thereafter revoked that consent.

[17]    Unlike *G.M. Sign, Inc. v. Grp. C Commc'ns, Inc.*, No. 08-cv-4521, 2010 WL 744262, at *6 (N.D. Ill. Feb. 25, 2010), where the defendant made "hypothetical" and "vague assertions about potential individual issues of consent," the individualized issues of consent are far from hypothetical – as demonstrated by the two named plaintiffs here and the plaintiffs in the California matter. Doron Decl. ¶¶ 42-64.

Yahoo is a member of the DMA. FCC Ruling ¶ 102 (DMA members not required to comply with "prior express written consent" requirement until 90 days after July 10, 2015 FCC Ruling); Andrews Decl. ¶ 20. Plaintiffs' argument, therefore, that Yahoo is required to comply with the 2013 regulations on telemarketing messages to obtain consent for the Welcome Messages has been definitively refuted by the FCC Ruling.[18]

ii.  Yahoo Users Provided Prior Express Consent Through The Yahoo Terms Of Service

To create a Yahoo account, a registrant must have agreed to the then-current version of Yahoo's terms of service agreement. Andrews Decl. ¶ 2. Many users have assented to multiple different versions over time. *Id.* Yahoo's uTOS governs every user's relationship with Yahoo and use of all products and services offered by Yahoo. *Id.* ¶ 3. Yahoo users may also have agreed to additional terms of service that govern the use of certain Yahoo products and services, such as Yahoo's Comms ATOS (which incorporates the uTOS) and pertains to Yahoo Mail and Yahoo Messenger, including the PC2SMS Service. *Id.* ¶ 4.

Yahoo users also have been prompted to reaffirm their assent to Yahoo's various terms of service as a requirement to continue using their Yahoo account such as when, starting in 2010, Yahoo introduced a new mail platform and required all current subscribers to agree to the then-current Comms ATOS agreement and the uTOS. *Id.* ¶ 18. Additionally, each time a user installed a Yahoo application, set up a new Yahoo account or signed up for a new Yahoo service, the user was required again to agree to the then-current version of the terms of service agreement(s). *Id.* ¶ 17.

Users were required to provide express affirmative assent to these terms of service

---

[18]     Even if the heightened consent standard applied (and it does not), the Welcome Message is neither an advertisement nor constitutes telemarketing. *See, e.g., Aderhold v. Car2go N.A., LLC*, No. C13-489RAJ, 2014 WL 794802, at *9 (W.D. Wash. Feb. 27, 2014). Indeed, plaintiff Johnson admitted that the Welcome Message was not an advertisement. Johnson Dep. 44:19-45:9 ("I don't see it as an advertisement"). Additionally, members of the class who are Yahoo users all assented to the written terms of service agreements, which assent is deemed "written" under the eSIGN Act, 15 U.S.C. § 7001.

agreements to use Yahoo's products and services. *Id.* ¶ 17. As such, Yahoo's terms of service agreements are enforceable "clickwrap" agreements. *See In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1028-29 (N.D. Cal. 2014) (enforcing Yahoo's ATOS agreement, concluding "the ATOS establishes explicit consent by Yahoo Mail users to Yahoo's conduct")); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir. 1996). Here, plaintiff Calderin and other class members who are Yahoo users were presented with clear and conspicuous links to the uTOS and Comms ATOS and were required to affirmatively manifest their assent by clicking a button to continue. Andrews Decl. ¶¶ 6, 8.

By agreeing to one or more terms of service agreements, Yahoo users consented to receive the Welcome Message. However, establishing this "prior express consent" necessarily involves individualized proof because the nature and extent of the consent provided will vary based on the factual circumstances of each putative class member, each with his or her own "consent profile." Indeed, Yahoo often does not know and cannot determine, without an individualized inquiry, the scope of the user's consent to receive communications from Yahoo. *Id.* ¶ 19.

The uTOS expressly provides consent for Yahoo to send users text messages. *Id.* ¶ 15, Ex. D (uTOS) ¶ 24 ("Yahoo! may provide you with notices, including those regarding changes to the TOS, including by but not limited to email, regular mail, SMS, MMS, text message, postings on the Service, or other reasonable means now known or hereinafter developed."). By agreeing to the uTOS, users agreed that Yahoo may send them communications regarding all aspects of the services Yahoo provide. *See id.* Ex. D ¶ 2. The Comms ATOS contains a similar provision. *See id.* Ex. A (Comms ATOS at ¶2(e)).

Where class members received "different disclosures depending" on when they registered an account, and differed in the manner by which they agreed to the applicable terms of service, individualized inquiries are required. *In re: Google Inc. Gmail Litig.*, No.: 13-MD-02430-LHK, 2014

16

WL 1102660, at *15 (N.D. Cal. Mar. 18, 2014) (individualized issues regarding consent predominated where Gmail users were provided different terms of service disclosures depending on the educational institution with which they were affiliated).[19] In other words, even if the Court determines that agreeing to one version of the terms of service through one means (e.g., when creating an account) at a given time constitutes prior express consent, that does not mean that assenting to another version of the terms of service through another means (e.g., downloading an application) at another time, is similarly valid consent. Determining the validity and scope of consent provided at a given time by the specific terms of service at issue and the means by which assent was given is indisputably an individualized inquiry that will involve analyzing over 200 permutations.[20] Doron Decl. ¶¶ 31-38, Ex. I. Unquantifiable additional permutations arise from a person revoking – through "any reasonable method, including orally or in writing" – any previously granted consent, and in most instances, there would be no way to know whether Yahoo knew or had "reason to know" of the revocation. FCC Ruling ¶¶ 56, 58 & n.223, 64; Doron Decl. ¶ 40.

> iii. <u>Yahoo Users Who Provided Their Phone Numbers To Yahoo Provided Prior Express Consent</u>

Yahoo users also provided consent to receive the Welcome Message by providing their mobile numbers to Yahoo in connection with their accounts (all members of Subclass B and some members of Subclass A). FCC Ruling ¶ 52 ("For non-telemarketing and non-advertising calls,

---

[19]    The facts of this case are easily distinguishable from those in *In Re Yahoo Mail Litig.*, Case No. 13-cv-04980, 2015 WL 3523908, ___ F.R.D. ___ (N.D. Cal. May 26, 2015), where the court (in a non-TCPA case) certified a class under *Rule 23(b)(2)* – not Rule 23(b)(3) – *of only non-Yahoo users*. As the court in *In Re Yahoo Mail* explained, the difference between a class under Rule 23(b)(2) and 23(b)(3) is critical: "Plaintiffs in the instant case do not bear the burden of showing that a common question of law or fact predominates over individual questions. Instead, Plaintiffs need only show the existence of a common question of law or fact that is significant and capable of classwide resolution." 2015 WL 3523908, at *11. Further, "as a matter of practical application, the ascertainability requirement serves little purpose in Rule 23(b)(2) classes, as there will generally be no need to identify individual class members." *Id.* at *16.
[20]    While the relevant provisions of the Yahoo terms of service agreement have largely been unchanged since 2007, (further) limiting the class to those Yahoo users who created an account after 2007 does not eliminate the individualized inquiries that have to be made surrounding the various types of contract formation that occurred because the assent procedure to the terms of service was different upon creating an account and agreeing to the migration to the new mail platform or downloading an application. Andrews Decl. ¶19.

express consent can be demonstrated by the called party giving prior express oral or written consent or, in the absence of instructions to the contrary, by giving his or her wireless number to the person initiating the autodialed or prerecorded call."). Courts agree with the FCC that providing a phone number is sufficient to constitute prior express consent.[21]

Plaintiff Calderin consented to receive the Welcome Message by voluntarily providing her phone number to Yahoo, even if the number was not provided for the exact purpose of receiving such text messages from Yahoo. *See Hudson*, 2014 WL 2892290, at *6 ("The TCPA does not require that calls be made for the exact purpose for which the number was provided, but rather that the call bear some relation to the product or service for which the number was provided.") (quotation marks and citation omitted). Here, users who provided their phone number to Yahoo did so in connection with Yahoo's services, and the Welcome Message pertained to a Yahoo service.

## 2. Putative Class Members May Have Provided Consent Through Intermediaries

As illustrated through the named plaintiffs in this case, Yahoo may have also obtained prior express consent through an intermediary – *i.e.*, a Yahoo user who sent a personalized PC2SMS text to a purported class member – triggering the Welcome Message. The FCC recently reaffirmed the 2014 ruling in *Matter of GroupMe, Inc./Skype Commc'n S.A.R.l Pet. for Expedited Declaratory Rul. R. & Regulations Implementing the Tel. Consumer Protec. Act of 1991*, 29 F.C.C. Rcd. 3442 (F.C.C. 2014), that consent exists for a texting platform to send messages where a consumer provides his or her wireless telephone number to the user of the platform, an "intermediary." FCC Ruling ¶¶ 49.[22]

---

[21]     *See Hudson v. Sharp Healthcare*, 13-CV-1807-MMA (NLS), 2014 WL 2892290 (S.D. Cal. June 25, 2014) (plaintiff provided prior express consent to receive prerecorded calls regarding her outstanding balance owed to the defendant when she provided her cellular telephone number to the defendant); *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-cv-1459-Orl-36KRS, 2013 WL 6865772, at *5 (M.D. Fla. Dec. 31, 2013) ("Murphy's provision to the Defendants of his cellular phone number constituted his express consent to the Defendants to call him at that number.") (citation omitted).

[22]     *See also Baisden v. Credit Adjustments, Inc.*, No. 2:13-CV-992, 2015 WL 1046186, at *__ (S.D. Ohio Mar. 10, 2015) (patients provided prior express consent through a hospital to receive autodialed or prerecorded calls from a third-party health care provider); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1124-25 (11th Cir. 2014) (husband provided "prior express consent to receive autodialed or prerecorded calls" through wife where wife gave consent to a hospital to contact her husband directly).

Both named plaintiffs likely provided intermediary consent. Calderin received the text from her friend and co-worker, who worked within sight of Calderin and with whom she regularly communicated via text message. *See supra* at 3-4. Similarly, Johnson received a message related to debt alleviation services following her application for online loan services in connection with which she agreed to receive messages from an automatic dialer. Johnson Dep. 59:2-11. Accordingly, Yahoo believes that she likely consented to be contacted relating to debt services through one of the entities to whom she was indebted or who she contacted.[23]

As recently acknowledged by the FCC, individualized inquiries would have to be performed to determine whether intermediary consent was "actually obtained," whether there were "instructions to the contrary" given by the owner of the number, and whether the number was obtained directly from the owner or "by any variety of means" that would not amount to consent. FCC Ruling ¶ 52.

### 3. Each Channel Of Consent Involves Numerous Factual Inquiries From Heterogeneous Sources Necessitating Individualized Inquiry

Proof of "prior express consent" necessarily involves individualized inquiries because the nature and extent of the consent provided (including whether and when consent was ever revoked) would vary based on the factual circumstances of each putative class member. A comprehensive illustration of the various factual permutations involved in this analysis is provided in Exhibit I to the Doron Declaration.

The individual circumstances of the named plaintiffs here, as well as the named plaintiffs in the parallel California action, are demonstrative of the necessary individualized inquires:

- Calderin is a Yahoo user who provided her phone number to Yahoo prior to receiving the Welcome Message, but did so before she ultimately agreed to the Comms ATOS. Doron Decl. ¶ 44. Calderin also likely provided consent through an intermediary. *Supra* at 3-4. Unknown whether consent revoked by Calderin or her mother (the account holder). Doron Decl. ¶ 40.
- Johnson is not a Yahoo user, but like Calderin, also likely provided consent through an

---

[23]    Johnson's failure to preserve her mobile phone means key evidence on her prior consent has been lost, substantially prejudicing Yahoo's defense in this regard.

intermediary. Unknown whether consent revoked. *Supra* at 2-3. Doron Decl. ¶ 50.

- California action plaintiff Pathman created her first Yahoo account pre-2007, agreed to the Comms ATOS in 2012, created a second Yahoo account in March 2013, and provided her number to Yahoo in connection with her first account *after* receiving the message.[24] Unknown whether consent revoked. Doron Decl. ¶¶ 53-54.
- California action former named plaintiff Sherman registered at least three Yahoo accounts, assented to the Comms ATOS, and provided his mobile number to Yahoo *before* he received the Welcome Message. Sherman also likely provided consent through an intermediary. Unknown whether consent revoked. Doron Decl. ¶¶ 58-62.

These individual consent profiles would not have been revealed without extensive individual discovery (including 12 depositions) in this and the California lawsuit. Similar individualized inquiries would be necessary with respect to each of the potentially ███ putative class members to determine liability. This is not a situation where consent can simply be resolved by deciding whether a certain act constitutes prior express consent. Hence liability is not as simple or straightforward as plaintiffs suggest, and resolution of this issue will require individualized proof.

## C.   **Class Action Is Not Superior To Individual Prosecution Of Claims**

A plaintiff must show that class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." *See Amchem*, 521 U.S. at 614-15. In this case,[25] class certification is not superior to other methods of addressing plaintiffs' claims. First, plaintiffs' proposed Class and Subclasses promote piecemeal litigation, not a true class action. This is

---

[24] Individuals can have multiple Yahoo accounts but choose to associate a phone number to only one of those accounts. Because a cross-reference of the Optin DB and UDB can only identify accounts for which a telephone number was associated, it would require an individualized inquiry to determine which of those Yahoo users have another Yahoo ID and the version(s) of the uTOS and/or Comms ATOS agreements assented to by the user in connection with those other accounts.

[25] Plaintiffs suggest that at least "fifty courts" have certified TCPA class actions as of 2010. Mot. at 7 (citing *Karen S. Little, LLC v. Drury Inns, Inc.*, 306 S.W.3d 577, 584 n.5 (Mo. Ct. App. 2010)). These "fifty" cases all concern blast faxes under a different statutory provision, 47 U.S.C. § 227(b)(C). Here, it is not possible to reliably identify, when provided with only a list of phone numbers, the identity of the individual who actually received a particular text message. Aron Decl. ¶ 23. Plaintiffs also cite to certain post-2010 TCPA cases and suggest that four of these cases concerned unsolicited text messages, but ignore critical differences between these four cases and the present action before the Court. *Kristensen*, 12 F. Supp. 3d 1292 and *Lee v. Stonebridge Life*, 289 F.R.D. 292 are discussed above at 9. *Stern v. DoCircle, Inc.*, No. SACV 12-2005 AG, 2014 WL 486262 (C.D. Cal. Jan. 29, 2014) is distinguishable because the court noted that the defendant (unlike Yahoo) had presented no evidence of individualized consent that would require individualized inquiry. The court made clear, however, that it would consider decertifying the class if such individualized inquires became necessary (as they are here). *Id.* at *8-9. Similarly, in *Agne v. Papa John's Intern., Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012), defendant presented no evidence of individualized issues of consent. *Id.* at 570. Here, by contrast, Yahoo has presented compelling evidence of consent that would require individualized inquiry. *See supra* at 19.

evidenced by the parallel California action, which seeks certification of a completely different class as a means of addressing the identical purported "injury" – one based on a different time period, different cell phone carrier, and a different relationship with Yahoo. Boyajian Decl. ¶ 10. Based on the way plaintiffs (and their lawyers, who are also counsel in the California action) have divided the class, Yahoo would now face potentially dozens of class actions for each month and each carrier carved out from plaintiffs' original class definitions.[26] This inefficient process, which could easily lead to wildly inconsistent results is precisely what the class action mechanism was intended to avoid. *See Am. Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 553 (1974) ("efficiency and economy of litigation … is a principal purpose of the [class action] procedure."). In particular, Rule 23(b)(3)'s predominance and superiority requirements were added "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615, (1997) (quoting Fed. R. Civ. P. 23(b)(3) Adv. Comm. Notes to 1966 Amendment)).

Second, the individual prosecution of claims is superior because the TCPA provides for statutory damages and does not provide for attorneys' fees.[27] Indeed, Congress contemplated that TCPA claims could be brought as small claims court actions, without any accounting for attorneys' fees. *See* 137 Cong. Rec. S16204-01, 1991 WL 229525 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings, TCPA's sponsor) ("[I]t is my hope that States will make it as easy as possible for

---

[26]     This piecemeal litigation, including the current proposed classes and other idiosyncratic one month classes likely to emerge if this class is certified, will lead to a "race" among classes, with each vying to get paid first. This is not judicially economical and could result in unfairness to both Yahoo and the putative classes.

[27]     Additionally, the Supreme Court has recently granted *certiorari* in two cases that would significantly reduce – if not eliminate – the proposed class because of the absence of injury. *See Robins v. Spokeo, Inc.,* 742 F.3d 409 (9th Cir. 2014), *cert granted,* 135 S. Ct. 1892 (U.S. Apr. 27, 2015) (No. 13-1339) (on the issue of standing; Yahoo has asserted in its answers to the Johnson and Calderin Complaints that plaintiffs lack Article III standing, and class certification should be denied on this additional ground); *Bouaphakeo v. Tyson Foods Inc.,* 765 F.3d 791 (8th Cir. 2014), *cert granted,* 135 S. Ct. 2806 (2015) (granting *certiorari* to decide whether a class action may be certified or maintained under Rule 23(b)(3) when the class contains hundreds of members who were not injured and have no legal right to any damage).

21

consumers to bring [TCPA claims], preferably in small claims court [and] it would defeat the purposes of the bill if the attorneys' costs to consumers of bringing an action were greater than the potential damages"). The availability of statutory damages creates an "adequate incentive" for individuals to bring suit on their own behalf. *See, e.g., Smith v. Microsoft Corp.*, 297 F.R.D. 464, 469 (S.D. Cal. 2014) ("The TCPA allows a litigant to seek statutory damages of $500 for each violation, and potentially treble damages;" "individual plaintiffs may bring TCPA cases in small claims court without an attorney."); *Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 404 (E.D. Pa. 1995) ("The [TCPA's] statutory remedy is designed to provide adequate incentive for an individual plaintiff to bring suit on his own behalf.").

Third, as set forth in the expert declaration of Dr. Danah Boyd, the PC2SMS Service offers a tremendous benefit to many categories of consumers, and as a result, many would not want to participate in this class action. Boyd Decl. ¶¶ 7, 28.[28]

Fourth, class certification is not proper because of the financial impact it would have on Yahoo and the "disproportionality of a damage award that has little relation to the harm actually suffered by the class, and on the due process concerns attended upon such an impact." *In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 351 (N.D. Ill. 2002) (citations omitted).

**D.      Neither Plaintiff Is A Typical NOr Adequate Class Representative**

A class representative must be able to "fairly and adequately protect the interests of the class," and "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3), (4). A plaintiff is not "typical" where his or her individual claim may fail on grounds unique to the plaintiff, leaving absent class members with meritorious claims in the lurch. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724

---

[28]      Those few putative class members who were unhappy about receiving the Welcome Message that was appended to the first text message they received from a friend can seek statutory damages in federal or state court (including potentially small claims court).

22

(7th Cir. 2011). Similarly, a plaintiff is "adequate" only where the plaintiff provides an "adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Franks v. MKM Oil, Inc.*, No. 10 CV 00013, 2012 WL 3903782, *9 (N.D. Ill. Sept. 7, 2012) (quotation marks and citation omitted).

### 1. Plaintiff Calderin Is Not Typical Or Adequate

Calderin likely participated in, or *at least* had knowledge of, a plan to manufacture this lawsuit by triggering her receipt of the Welcome Message. A plaintiff is not an adequate class representative where there is a genuine concern of a conflict of interest with the class. In *Langendorf*, this Court found a plaintiff to be an inadequate class representative where the plaintiff retained counsel recommended by her father, who had a professional relationship with such counsel. *Langendorf v. Skinnygirl Cocktails, LLC*, No. 11 CV 7060, 2014 WL 5487670, at *3 (N.D. Ill. Oct. 30, 2014). Based on the events described above (*see supra* at 3-4), Calderin's relationship with her counsel, her credibility, and the propriety of her conduct, will be at issue. With this appearance of impropriety, Calderin faces "serious credibility problems" and "is likely to devote too much attention to rebutting an individual defense [and thus] may not be an adequate class representative." *CE Design*, 637 F.3d at 724 ("even an arguable defense peculiar to the named plaintiff…may destroy the required" typicality and adequacy; "fear" is that the named plaintiff will become distracted by a "possible defense applicable only to him so that the representation of the rest of the class will suffer.").[29]

### 2. Plaintiff Johnson Is Not Typical Or Adequate

Plaintiff Johnson failed to preserve her mobile phone ***after*** she retained counsel and filed her claims against Yahoo. *See supra* at 5. This failure substantially prejudices Yahoo. Without Johnson's

---

[29]     *See also Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 495 (7th Cir. 2013) ("[W]hen 'class counsel have demonstrated a lack of integrity' through misconduct and unethical action, 'a court can have no confidence that they will act as conscientious fiduciaries of the class'.").

mobile phone, Yahoo cannot determine, for instance, whether Johnson regularly received other text messages concerning offers for personal loans. Such other text messages would significantly bolster Yahoo's defense that Johnson consented to receive texts and phone calls in connection with personal loans, the subject of the underlying PC2SMS message.

Nor can Yahoo determine whether Johnson ever downloaded a Yahoo application to her phone, which would have required her assent to terms of service agreements that provide consent for Yahoo to send text messages. Andrews Decl. ¶ 17 (Yahoo account not required to download some Yahoo applications). Without the phone, or the opportunity to take a forensic image (which would capture deleted information), Yahoo will never know whether Johnson downloaded an application and thereby provided consent to receive text messages from Yahoo. Boyajian Decl. Ex. Y.

Yahoo has grounds to bring a motion for sanctions against Johnson for spoliation of critical evidence. *See, e.g., Kucala Enter., Ltd. v. Auto Wax Co.*, No. 02 C 1403, 56 Fed. R. Serv. 3d (Callaghan) 487 (N.D. Ill. May 27, 2003) (sanctioning plaintiff for evidence spoliation after defendant's expert discovered that plaintiff had installed and used software on his computer that eliminated deleted files from the hard drive). Johnson's defense of a spoliation claim, and the possibility of a sanction impacting Johnson's ability to argue that she did not consent to receive the Welcome Message, would hinder her ability to represent the proposed class. As such, Johnson's claims and defenses are not typical and she is not an adequate representative of the class. *See Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986).

### 3. Plaintiffs And Class Counsel Have Abandoned The Interests Of Putative Class Members To Maintain Their Own Claims And Interests

Rule 23 also requires the adequacy of class counsel. *See* Fed. R. Civ. P. 23(g)(2); *see also Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) ("the performance of the class lawyer is inseparable from that of the class representative."). Class counsel acts as a fiduciary of the class

24

and must demonstrate they will "prosecute the case in the interest of the class ... rather than just in their interests as lawyers who if successful will obtain a share of any judgment or settlement as compensation for their efforts." *Savanna Group v. Truan*, No. 10 C 7995, 2013 WL 626981, at *1 (N.D. Ill. Feb. 220, 2013) (quoting *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011)). Where class counsel violates this fiduciary obligation, "he is not an adequate representative of the interests of the class as a whole [and] realism requires that certification be denied." *Culver*, 277 F.3d at 913 (citations omitted).

Here, plaintiffs' counsel has cast aside more than 96% of the purported class, as alleged in the Complaints, in an apparent attempt to preserve the viability of the named plaintiffs – and, no doubt, their counsel – in prosecuting these lawsuits under Rule 23. Specifically, plaintiffs originally purported to bring claims on behalf of a class of individuals not limited by wireless service provider, who received text messages from Yahoo during a 48 month period. *See* Compl. at ¶ 23. In their motion for class certification, plaintiffs and their counsel narrowed the time frame for class membership from 48 months to two separate one-month periods and expressly excluded anyone whose cell phone numbers were not provided by Sprint, in one case, or T-Mobile, in the other.[30]

Plaintiffs and their counsel's self-preservation efforts have come at the expense of the class. As such, they are not adequate representatives of the class and certification should be denied.

## V.    CONCLUSION

For the foregoing reasons, Yahoo respectfully requests that this Court enter an Order denying Plaintiffs' Corrected Consolidated Motion For Class Certification, and granting such other and further relief as the Court deems necessary and appropriate.

---

[30]    Indeed, plaintiffs have jettisoned over 96% of the original class without properly amending their Complaints. A plaintiff seeking class certification is typically held to the definition espoused in the relevant complaint. *See Brink's Mfg.*, 2011 WL 248511, at *4 (noting a new proposed class definition where time frame for class eligibility was reduced from four years to four months in plaintiff's motion for certification in a TCPA case was "inconsistent" with the purported class definition in the complaint).

Dated: July 21, 2015                                    YAHOO! INC.


                                                        By: /s/  Francis A. Citera

                                                         One of Its Attorneys

Francis A. Citera (ARDC # 6185263)
Brett M. Doran (ARDC # 6286057)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
citeraf@gtlaw.com
doranb@gtlaw.com


Ian C. Ballon (Appearing *Pro Hac Vice*)
Lori Chang (Appearing *Pro Hac Vice*)
Nina D. Boyajian (Appearing *Pro Hac Vice*)
Justin Barton (Appearing *Pro Hac Vice*)
Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Tel: (310) 586-7700
Fax: (310) 586-7800
ballon@gtlaw.com
changl@gtlaw.com
boyajiann@gtlaw.com
bartonju@gtlaw.com

## CERTIFICATE OF SERVICE

I, Brett M. Doran, hereby certify that on July 21, 2015, I electronically filed **Defendant**

***Yahoo! Inc.'s Opposition to Plaintiffs' Consolidated Motion for Class Certification*** to be served by

the Clerk of the Court via the ECF system upon all attorneys of record who are registered for

electronic filing.

_____/s/ Brett M. Doran_____